UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEON GREATHOUSE,<br><br>                          Plaintiff,<br><br>  -against-<br><br>FREDDY VASQUEZ and THE CITY OF NEW YORK,[1]<br>                          Defendants. | **AMENDED COMPLAINT**<br><br>*Leave to File Granted April 18, 2022*<br><br>Civil Action No. 20 Civ. 8748 (PAE) (SN)<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Leon Greathouse, for his amended complaint, alleges the following:

**INTRODUCTION**

1.  This is a civil rights action brought by Plaintiff Leon Greathouse, seeking redress for a prosecution maliciously commenced and maintained against him for nearly two decades—even though, throughout that period, prosecutors recognized that they lacked sufficient evidence against him even to obtain an indictment.

2.  In 2000, Plaintiff was arrested for the murder of Leonard Pickney—a horrendous crime that Plaintiff did not commit—by Defendant Freddy Vasquez, even though Defendant Vasquez acknowledged that Plaintiff was not responsible for Mr. Pickney's death. Plaintiff was then arraigned in New York State Court, upon a felony criminal complaint, for murder in the second degree.

3.  The New York County District Attorney's Office ("DANY"), responsible for prosecuting this case, recognized that it did not have probable cause to believe that Plaintiff

---

[1] The spelling of Defendant Vasquez's first name is corrected from the initial complaint.

committed murder, and never attempted to present the case to a grand jury.

4. Nevertheless, DANY did not dismiss the felony criminal complaint for more than *seventeen years*, after Plaintiff, who was then incarcerated on an unrelated narcotics offense, managed to obtain the assistance of the Legal Aid Society. As a result of the prosecution commenced by Defendant Vasquez and maintained by DANY, Plaintiff was injured repeatedly, including by losing placement in favorable correctional programming and being denied parole—in which Plaintiff had a constitutionally protected liberty interest under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution—on multiple occasions.

5. Upon information and belief, DANY routinely refuses to dismiss open felony criminal complaints such as the long-outstanding complaint against Plaintiff, even where DANY knows that it lacks either the intention or the evidentiary capability to seek indictments. Such conduct has harmed and continues to harm many individuals besides Plaintiff.

6. In addition to seeking redress from Defendant Vasquez for his wrongful commencement of the murder prosecution against Plaintiff, this action seeks to hold Defendant City of New York accountable because the Due Process violations and other unlawful acts described herein foreseeably resulted from the deliberate indifference of policymakers from DANY to patterns of similar unconstitutional and unlawful conduct by their prosecutors.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4), because the matters in controversy arise under the Constitution and laws of the United States and because this is an action to redress the violation of Plaintiff's constitutional and civil rights.

8. Venue is proper in the U.S. District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to Plaintiff's claims took place in the Southern District of New York.

9. The murder prosecution against Plaintiff favorably terminated on October 19, 2017, when the murder charge against Plaintiff was dismissed. Plaintiff filed a *pro se* complaint within three years of that favorable termination.

10. Plaintiff's claims in this Amended Complaint are timely filed because New York's three-year statute of limitations for personal injury claims, N.Y. C.P.L.R. § 214(5), applies to claims brought pursuant to 42 U.S.C. § 1983, *see Okure v. Owens*, 488 U.S. 235, 251 (1989); *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013), and because the instant claims relate back to the claims in Plaintiff's *pro se* complaint.

11. Plaintiff was granted leave to amend on April 18, 2022.

**JURY DEMAND**

12. Plaintiff demands a trial by jury in this action on all claims for which a jury trial is legally available.

**PARTIES**

13. Plaintiff is an adult male citizen of the United States and of the State of New York, and a resident of the County of New York. For much of the time periods relevant to this litigation, Plaintiff was incarcerated in correctional facilities located in the State of New York.

14. Defendant Freddy Vasquez (Shield No. 4413), is a retired employee of the City of New York. At the time of Plaintiff's 2000 arrest, Defendant Vasquez was a member of the New York City Police Department ("NYPD"), and assigned to the 28th Precinct as a Detective.[2] At

---

[2] Defendant Vasquez's initial disclosures identify his shield number as 4423. Plaintiff believes, based on publicly available information, that Defendant Vasquez's shield number is 4413. Certain publicly

that time, Defendant Vasquez was acting under the color of state law and within the scope of his capacity as an agent, servant, or employee of the NYPD and the City of New York. Defendant Vasquez is sued in his individual capacity.

15. Defendant City of New York is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the NYPD and its employees, and DANY and its employees.

**STATEMENT OF FACTS**

*Detective Vasquez Wrongfully Commences the Murder Prosecution Against Plaintiff*

16. On June 1, 2000, Leonard Pickney was shot and killed in the County of New York, in the neighborhood of Harlem.

17. The shooting was investigated by members of the NYPD's 28th Precinct, including Defendant Vasquez.

18. Based on its investigation, the NYPD determined that the offense involved multiple perpetrators.

19. The NYPD recovered a firearm from the crime scene, but, upon information and belief, never identified a link between that firearm and Plaintiff.

20. Shortly after the shooting, the NYPD posted "Wanted" posters featuring Plaintiff's image throughout Harlem, in connection with Mr. Pickney's death.

21. On or about June 11, 2000, Plaintiff, having learned that he was "wanted" by the NYPD, voluntarily presented himself to the NYPD's 28th Precinct.

---

available information also suggests that Defendant Vasquez was assigned to the NYPD's 26th Precinct at some point in his career, but Plaintiff believes, based on the information in Defendant Vasquez's initial disclosures, that he was assigned to the 28th Precinct at the time of Plaintiff's arrest.

22. At the precinct, Defendant Vasquez interrogated Plaintiff. Plaintiff informed Mr. Vasquez that, at the time Mr. Pickney was shot, Plaintiff was at home, and that he had not been involved in the shooting.

23. Defendant Vasquez informed Plaintiff that he believed Plaintiff did not shoot Mr. Pickney, but also stated that he had to arrest Plaintiff because of the seriousness of the circumstances and because Plaintiff's image was on the "Wanted" poster.

24. Defendant Vasquez knew that Plaintiff did not shoot Mr. Pickney, and knew that Plaintiff was not otherwise responsible for Mr. Pickney's death.

25. Defendant Vasquez nevertheless placed Plaintiff under arrest.

26. Defendant Vasquez swore out a felony criminal complaint falsely representing that Plaintiff shot Mr. Pickney and caused his death, thereby committing murder in the second degree.

27. Defendant Vasquez arrested Plaintiff and swore out the above-mentioned felony criminal complaint in order to satisfy pressure from the NYPD to make it appear that the NYPD had solved this serious offense, and to avoid blame and embarrassment for letting a potential suspect go free.

28. Upon information and belief, Defendant Vasquez, in furtherance of this objective, hid, disregarded, and failed to investigate additional exculpatory evidence, including eyewitnesses who identified other individuals as responsible for shooting and killing Mr. Pickney.

29. Plaintiff was arraigned in New York County Criminal Court on or around June 12, 2000. The Assistant District Attorney representing DANY at Plaintiff's arraignment stated that DANY intended to present the matter to a grand jury, and falsely represented that "several

witnesses" to the shooting and "the weapon recovered at the scene" inculpated Plaintiff. Plaintiff was remanded to prison.

***DANY Recognizes it Has No Case to Pursue, But Refuses to Dismiss the Murder Charge***

30. On or around June 16, 2000, Plaintiff was released on his own recognizance pursuant to N.Y. C.P.L. § 180.80 because DANY—recognizing that it would not be able to secure an indictment—had not presented the murder charge against Plaintiff to a grand jury.

31. At the next court appearance in the matter, on or around July 28, 2000, the Assistant District Attorney representing DANY informed the court that there had "been no grand jury action" to date.

32. For the next five years, calendar calls in the case were held approximately every three months. At these court appearances—where often neither Plaintiff nor counsel for Plaintiff was present—DANY repeatedly informed the court that the status quo was unchanged: there still had been no grand jury action in the case.

33. On information and belief, to the extent DANY conducted any investigation of Mr. Pickney's death during this time period, the information it obtained reinforced DANY's understanding that Plaintiff did not shoot and kill Mr. Pickney.

34. In approximately January 2005, Plaintiff moved to dismiss the felony criminal complaint against him in the interests of justice. DANY opposed the motion, even though the assigned Assistant District Attorneys knew that they lacked sufficient evidence even to establish probable cause to indict Plaintiff in connection with Mr. Pickney's death.

35. Beginning in or about July 2005, scheduled court appearances in this matter slowed to approximately one per year. At these annual appearances, DANY continued to reiterate that there had been no grand jury action in the case.

36. In January 2010—after several years of these annual appearances, with no indication that DANY intended to indict the case—Plaintiff wrote to the Supreme Court of the State of New York to inquire whether the felony criminal complaint remained pending against him. The court wrote back confirming that the felony complaint was still pending, but that it had been calendared only annually for several years. The court referred Plaintiff's inquiry to the Criminal Court of the City of New York.

37. The Criminal Court of the City of New York subsequently inquired of DANY about the status of the felony criminal complaint. DANY falsely represented that the matter was being actively investigated.

38. At the annual calendar call the following year, at which only the prosecution appeared, the presiding judge—emphasizing the eleven years that had elapsed since the proceeding had been initiated, without any apparent action from DANY—asked whether DANY "ha[d] any plans with respect to this case?" The Assistant District Attorney representing DANY responded that he "ha[d] no information at this time with respect to how we will move forward on this case."

39. At the next court appearance, in July 2012, the Assistant District Attorney representing DANY again represented that there had been no grand jury action. Plaintiff was not present at this proceeding, because he was incarcerated on an unrelated charge at the time and DANY failed to deliver to the Department of Corrections and Community Supervision an order to produce Plaintiff for the court appearance. Because Plaintiff was not present at the proceeding, the court issued a bench warrant.

40. Upon information and belief, no further court appearances in this matter took place for the next five years.

### *Effects of the Long-Pending Prosecution on Plaintiff*

41. Meanwhile, DANY's failure to dismiss the felony criminal complaint had significant and adverse ramifications for Plaintiff.

42. In 2002, Plaintiff was convicted on an unrelated narcotics charge, and imprisoned. Plaintiff was eligible for, and accepted into, the Lakeview Shock Incarceration Program, an intensive, highly structured 180-day program affording, *inter alia*, exercise, work therapy, substance abuse treatment, education, pre-release counseling, and life skills counseling. Graduates of the program typically obtain parole and take part in a special parole supervision program. At the time Plaintiff was accepted into the Shock Incarceration Program, program graduates experienced higher success rates across a variety of categories, including diminished time served, lower recidivism rates once released, and higher employment rates once released, compared to other inmates.[3]

43. Plaintiff was removed from the Lakeview Shock Incarceration Program because of the pending felony criminal complaint charging him with murder. On information and belief, DANY informed the program of the felony criminal complaint after Plaintiff declined to take part in a proffer session with prosecutors regarding Mr. Pickney's death. Plaintiff was released from prison in 2005, well after he would have been eligible for release had he been permitted to remain in the program. Plaintiff also was unable to benefit from the education, training, counseling, and special parole supervision available to Shock Incarceration Program graduates, which, as noted, help to prevent recidivism.

44. In 2007, Plaintiff was arrested on an unrelated narcotics offense. The following year, Plaintiff was convicted, and incarcerated again.

---

[3] *See generally* Dept. of Corr. Serv., The Nineteenth Annual Shock Legislative Report (2007), *available at* https://doccs.ny.gov/system/files/documents/2019/09/Shock_2007.pdf.

45. In 2013, Plaintiff appeared for a hearing before the New York State Parole Board (the "Parole Board"). In advance of the hearing, Plaintiff had been issued a Certificate of Earned Eligibility. Such certificates are issued by the Commissioner of the Department of Corrections and Community Supervision to inmates who have successfully participated in the work and treatment programs to which they are assigned.

46. New York law creates a presumption in favor of the parole release of an inmate who, like Plaintiff, has obtained a Certificate of Earned Eligibility. *See* N.Y. Correction Law § 805 (2013) ("[A]n inmate who is serving a sentence with a minimum term of not more than eight years and who has been issued a certificate of earned eligibility, ***shall*** be granted parole release . . . unless the board of parole determines that there is a reasonable possibility that, if such inmate is released, he will not live or remain at liberty without violating the law and that his release is not compatible with the welfare of society." (emphasis added)).

47. As a result of this presumption, Plaintiff had a liberty interest in his release on parole.

48. The materials the Parole Board reviewed in connection with Plaintiff's 2013 parole hearing emphasized the pending felony criminal complaint charging murder and the 2012 warrant issued in connection with that prosecution.

49. Further, a risk assessment prepared in connection with Plaintiff's 2013 parole hearing graded Plaintiff the highest possible risk to commit felony violence in the future. On information and belief, that grade was based primarily on the outstanding murder charge.

50. On information and belief, DANY provided a statement to the Parole Board recommending against his parole release because of the outstanding murder charge.

51. At his 2013 parole hearing, Plaintiff was questioned about the pending felony criminal complaint alleging murder. On information and belief, Plaintiff was denied parole substantially on the basis of this outstanding felony criminal complaint.

52. In May 2015, Plaintiff again appeared for a parole hearing before the Parole Board. In advance of the hearing, Plaintiff again had been issued a Certificate of Earned Eligibility.

53. The materials the Parole Board reviewed in connection with Plaintiff's 2015 parole hearing again emphasized the still-pending felony criminal complaint alleging murder.

54. A risk assessment prepared in connection with Plaintiff's 2015 parole hearing graded Plaintiff a very high risk to commit felony violence in the future. On information and belief, that grade was based primarily on the outstanding murder charge.

55. On information and belief, DANY provided a statement to the Parole Board recommending against his parole release because of the outstanding murder charge.

56. Once again, Plaintiff was questioned extensively about the still-pending felony criminal complaint. On information and belief, he was again denied parole substantially on the basis of this outstanding felony criminal complaint.

57. In 2017, Plaintiff again appeared for a parole hearing before the Parole Board.

58. The materials the Parole Board reviewed in connection with this 2017 parole hearing again emphasized the felony criminal complaint alleging murder.

59. On information and belief, a risk assessment prepared in connection with Plaintiff's 2017 parole hearing again deemed Plaintiff a high risk to commit felony violence in the future, based primarily on this outstanding murder charge.

60. On information and belief, DANY provided a statement to the Parole Board recommending against his parole release because of the outstanding murder charge.

61. Once again, Plaintiff was questioned extensively about the still-pending felony criminal complaint.

62. In May 2017, the Parole Board postponed for three months its decision whether to grant Plaintiff parole because of a "lack of consensus" among the Parole Board members. On information and belief, this lack of consensus arose from Plaintiff's felony criminal complaint.

63. In August 2017, the Parole Board again postponed its decision whether to grant Plaintiff parole, this time for six months, "DUE TO PENDING MURDER 2ND CHARGE."

64. Because of Plaintiff's prolonged incarceration, resulting from these denials and postponements of parole, Plaintiff suffered physical and emotional injuries.

### *Ultimate Dismissal of the Felony Criminal Complaint*

65. In 2017, Plaintiff sought and obtained assistance from the Legal Aid Society in challenging DANY's wrongful maintenance of the murder prosecution against him. The Legal Aid Society filed an Order to Show Cause why the felony criminal complaint should not be dismissed.

66. DANY initially refused to dismiss the felony criminal complaint.

67. However, on October 19, 2017, the Assistant District Attorney representing DANY moved for dismissal of the case, which he conceded was "exceedingly old."

68. The same Assistant District Attorney acknowledged that DANY "do[es] not possess sufficient evidence to be able to proceed to a grand jury or certainly to prove the case beyond a reasonable doubt," and further acknowledged the "adverse consequences" the prosecution had wrought for Plaintiff.

69. The court ordered the case dismissed the same day.

70. Plaintiff was granted parole in 2018, following DANY's dismissal of the felony criminal complaint.

## FIRST CAUSE OF ACTION
### Against Defendant Vasquez in his individual capacity under 42 U.S.C. § 1983
### (Malicious Prosecution)

71. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-70 above with the same force and effect as if fully set forth herein.

72. Defendant Vasquez initiated a prosecution of Plaintiff without any legal justification and without probable cause. Defendant Vasquez caused the commencement and continuation of criminal proceedings against Plaintiff.

73. Defendant Vasquez knew he lacked probable cause to arrest and commence the prosecution of Plaintiff for the murder of Leonard Pickney.

74. Defendant Vasquez acted with malice, and knew or was deliberately and recklessly indifferent to the fact that probable cause did not exist to arrest and commence the prosecution against Plaintiff.

75. Upon information and belief, Detective Vasquez hid, disregarded, and failed to investigate exculpatory evidence that would void any probable cause, even if such probable cause had existed.

76. Upon information and belief, Detective Vasquez did not make a complete and accurate statement of facts to the Assistant District Attorney who filed the felony criminal complaint against Plaintiff.

77. On or around October 19, 2017, the prosecution for murder terminated in Plaintiff's favor when the felony criminal complaint was dismissed.

78. As a direct and proximate result of Defendant Vasquez's actions, Plaintiff was wrongly arrested and detained, and suffered the other harms set forth in paragraphs 1-70 above.

## SECOND CAUSE OF ACTION
### Against Defendant Vasquez in his individual capacity under 42 U.S.C. § 1983
### (Abuse of Process)

79. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-78 above with the same force and effect as if fully set forth herein.

80. Defendant Vasquez used legal process to place Plaintiff under arrest.

81. Defendant Vasquez arrested Plaintiff in order to obtain a collateral objective outside the legitimate ends of the legal process, including in order to satisfy pressure from the NYPD to make it appear that the NYPD had solved this serious offense, and to avoid blame and embarrassment for letting a potential suspect go free.

82. Plaintiff was unaware of information relating to this collateral objective until the court proceeding at which the prosecution against him terminated.

83. Defendant Vasquez acted with intent to harm Plaintiff, and without excuse or justification.

84. As a consequence of Defendant Vasquez's conduct, Plaintiff was injured.

## THIRD CAUSE OF ACTION
### Against Defendant City of New York under 42 U.S.C. § 1983
### (Municipal Liability Under *Monell*)

85. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-84 above with the same force and effect as if fully set forth herein.

86. The Assistant District Attorneys who handled the murder prosecution against Plaintiff from its initiation through 2017 were aware that DANY lacked the intention to present

the murder case against Plaintiff to a grand jury, or, indeed, the evidence sufficient to establish probable cause and secure a grand jury indictment.

87. Nevertheless, these Assistant District Attorneys maliciously maintained the prosecution against Plaintiff—even as, on information and belief, DANY obtained evidence that affirmatively indicated Plaintiff's innocence.

88. Moreover, on information and belief, these Assistant District Attorneys repeatedly provided the Department of Corrections and Community Supervision and the Parole Board with statements regarding Plaintiff's arrest for murder and outstanding felony criminal complaint.

89. As a result of the wrongfully initiated murder prosecution, and of the information provided by these Assistant District Attorneys, Plaintiff was removed from the Lakeview Shock Incarceration Program and repeatedly denied parole.

90. DANY's conduct was conscience-shocking.

91. Plaintiff, having been issued Certificates of Earned Eligibility, had a constitutionally protected liberty interest in being granted parole, and, consequently, a constitutional right to fair parole hearings.

92. The repeated denial of parole violated Plaintiff's rights to substantive and procedural due process under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

93. Individually and collectively, DANY prosecutors' malicious maintenance of the prosecution against Plaintiff and their violation of Plaintiff's constitutional rights were directly, foreseeably, proximately, and/or substantially chargeable to Defendant City of New York, and resulted from deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to arrest and prosecution by DANY.

94. Under principles of municipal liability for federal civil rights violations, as well as New York State law, the District Attorney for New York County, along with his authorized delegates, has final authority and is the City of New York's policymaker in setting officewide policies, practices, and customs concerning the prosecution of criminal matters, and concerning the training, instruction, supervision, and discipline of Assistant District Attorneys regarding their conduct in criminal matters, including their constitutional obligation not to maintain prosecutions unsupported by probable cause, and not to deliberately ignore acting upon criminal complaints.

95. The District Attorney of New York County at the time of Plaintiff's arrest, Robert Morgenthau, and his successor, Cyrus Vance, personally and/or through their authorized delegates, at all relevant times had final authority, and constituted a City of New York policymaker for whom the City of New York is liable, with respect to such conduct.

96. On information and belief, prior to and at all times relevant to this complaint, the District Attorney of New York County and his authorized delegates maintained deliberate or de facto office-wide policies, customs, and/or practices that evidenced deliberate indifference to the constitutional rights of defendants who were arrested and prosecuted by DANY for alleged criminal conduct, including:

   a. Having a policy, custom, and/or practice of maintaining and prosecuting criminal actions where prosecutors reasonably believed they could not lawfully substantiate the allegations and/or establish probable cause to support the prosecutions;

   b. Having a policy, custom, and/or practice of providing misleading information to the Board of Parole regarding pending prosecutions without regard to prosecutors'

        ability to substantiate the allegations underlying those prosecutions and/or establish probable cause to support the prosecutions;

    c. Failing to train and supervise its prosecutors regarding when and why to dismiss felony criminal complaints;

    d. Failing to train and supervise its prosecutors regarding the proper disposition of long-pending complaints that have not proceeded to a grand jury.

97. Upon information and belief, these deliberate or de facto office-wide policies, customs, and/or practices have affected and harmed numerous individuals who were arraigned upon felony criminal complaints but never indicted.

98. The arrest and prosecution of Plaintiff, as well as his removal from the Lakeview Shock Incarceration Program and his repeated parole denials, were directly and proximately caused by the aforementioned policies, customs, and/or practices.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands the following relief against Defendants, jointly and severally:

    (a) Actual and punitive damages against Defendant Vasquez in an amount to be determined at trial;

    (b) Actual damages against the City of New York in an amount to be determined at trial;

    (c) Statutory attorneys' fees pursuant to 42 U.S.C. § 1988;

    (d) Reimbursement for the cost of this action;

    (e) Such other relief as the Court deems just and proper.

Dated:    New York, NY
          June 2, 2022

                PATTERSON BELKNAP WEBB & TYLER LLP

                By: /s/ James V. Masella, III
                James V. Masella, III
                Bonita Robinson
                1133 Avenue of the Americas
                New York, NY 10036
                212-336-2000
                *Attorneys for Plaintiff Leon Greathouse*